**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* JEFFREY HUBERT, THE STATE OF ILLINOIS *ex rel.* JEFFREY HUBERT, | |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, a Municipal Corporation, ALLTOWN BUS SERVICE, INC., an Illinois Corporation, A.M. BUS COMPANY, an Illinois Corporation, AMMONS TRANSPORTATION SERVICE, INC., an Illinois Corporation, CARAVAN SCHOOL BUS COMPANY,FALCON TRANSPORTATION, INC. an Illinois Corporation, ILLINOIS STUDENT TRANSPORTATION, INC., an Illinois Corporation, ILLINOIS CENTRAL SCHOOL BUS, INC., an Illinois Corporation, JACK HARRIS TRANSPORTATION, INC., an Illinois Corporation, JL HARRIS TRANSPORTATION, INC., an Illinois Corporation, LATINO EXPRESS, INC., an Illinois Corporation, RANSOM BUS COMPANY, R&D BUS COMPANY, SUNRISE TRANSPORTATION, INC., an Illinois Corporation, UNITED "QUICK" TRANSPORTATION, INC., an Illinois Corporation, WALLS TRANSPORTATION, INC. an Illinois Corporation, FIRST STUDENT, INC. a Florida Corporation, and CHICAGO SCHOOL TRANSIT, INC., an Illinois Corporation, | 16 CV 4336 |
| Defendants. | |

**<u>THIRD AMENDED COMPLAINT</u>**

Plaintiffs complain and state as follows:

## I. NATURE OF THE ACTION

1.      Plaintiff-Relator Jeffrey Hubert, while working for the Student Transportation Services Department of the Board of Education of the City of Chicago, discovered that Defendant yellow bus vendors colluded on price and were submitting false invoices based on those prices. These false invoices were for yellow bus services not actually provided to special needs students. The Board of Education of the City of Chicago knowingly paid these invoices, which were based on inflated ridership, to maximize reimbursement claims to the State and Federal Government. Among other things, Hubert discovered that a number of yellow bus vendors colluded and agreed on anticompetitive pricing during a bidding process that was intended to yield competitive pricing. Each monthly invoice submitted thereafter by vendors and approved by the Board of Education of the City of Chicago which was used to support reimbursement was a false claim.

2.      This is an action to recover damages and civil penalties on behalf of the United States of America under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended ("the FCA"), and a related state false claims act, the Illinois False Claims Act, 740 ILCS §§ 175/1 *et seq.* (Hereafter, the FCA and the Illinois False Claims Act will be referred to as the "FCAs." The United States and the State of Illinois are hereafter referred to as the "Governments.")

3.      These claims arise from false statements, records, and claims by Defendants and/or their agents, employees and co-conspirators in violation of the FCAs.  These violations involve false or fraudulent claims for payment or approval presented, or caused to be presented, and/or false records Defendants made, used, or caused to be made or used, in order to get false or fraudulent claims paid or approved by the Governments, and/or conspired to defraud the Governments by getting false or fraudulent claims allowed or paid.

4.      These claims are based on Defendants' knowing presentment to and acceptance by the Board of Education of the City of Chicago of invoices for bus services which were based on fixed prices, an inflated number of children riding school buses ("ghost riders"), and an inflated number of buses making trips ("ghost buses"), the purpose of which was to receive artificially high payments from the Governments to accommodate ghost riders on ghost buses, though these students were not actually receiving bus services.

5.      These claims are related to transportation services for special education students, which are tied to Medicaid funding.  Because the invoices submitted to the Board were based on fixed prices and intentionally inflated ridership numbers, artificially high Medicaid reimbursements were made for the fraudulent expenditures induced by the Defendants from the Board.

## II.     THE PARTIES

6.      Relator, Jeffrey Hubert ("Hubert" or "Relator") is a resident of Inverness, Illinois and the former Director of Transportation Operations for Student Transportation Services ("STS"), an arm of Chicago Public Schools ("CPS"). Hubert was hired primarily to perform contract and vendor management services.  Hubert was employed by Chicago Public Schools as a Director of Transportation Operations from January 14, 2013 through February 12, 2015.  At the time of his hiring, Hubert had extensive experience in the private sector working in logistics and management. Hubert brings this action for violations of the FCAs as set forth below, upon personal knowledge as to himself and his own acts, and on behalf of himself and the Governments under their respective *qui tam* provisions.

7.      Relator has personally seen and heard evidence of the Vendors and the Board's fraudulent practices.  Nevertheless, Relator does not have access to all documents that prove the

ongoing fraud perpetrated by the defendants. Documents to which Relator does not have access without formal discovery include, but are not limited to, monthly vendor-specific GPS reports; monthly driver payroll records of each vendor; proof of insurance paid for each bus by every vendor; Illinois Department of Transportation Safety Lane inspection reports for every bus used by every CPS vendor; and monthly Edulog run and route detail for every run and route allegedly run by each vendor.

8.      Defendant, The Board of Education of the City of Chicago ("Board") is a Municipal Corporation charged with running the Chicago Public School ("CPS") System. In running CPS, the Board provides transportation to Special Needs students using buses. To provide transportation to Special Needs students using buses, the Board contracts with private vendors who provide bus transportation services.

9.      Defendant, Alltown Bus Service, Inc., is an Illinois Corporation ("Alltown"), with its principal place of business in Chicago, Illinois. From May 2013 to present, Alltown contracted to provide bus services for Defendant Board.

10.      Defendant, A.M. Bus Company, is an Illinois Corporation ("A.M."), with its principal place of business in Chicago, Illinois. From May 2013 to present, A.M. contracted to provide bus services for Defendant Board.

11.      Defendant, Ammons Transportation Service, Inc., is an Illinois Corporation ("Ammons"), with its principal place of business in Chicago, Illinois. From May 2013 to present, Ammons contracted to provide bus services for Defendant Board.

12.      Defendant, Caravan School Bus Company, is an Illinois Corporation ("Caravan"), with its principal place of business in Chicago, Illinois. From May 2013 to present, Caravan contracted to provide bus services for Defendant Board.

13.     Defendant, Falcon Transportation, Inc., is an Illinois Corporation ("Falcon"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, Falcon contracted to provide bus services for Defendant Board.

14.     Defendant, Illinois Student Transportation, Inc., is an Illinois Corporation ("Illinois Student"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, Illinois Student contracted to provide bus services for Defendant Board.

15.     Defendant, Illinois Central School Bus, Inc., is an Illinois Corporation ("Illinois Central"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, Illinois Central contracted to provide bus services for Defendant Board.

16.     Defendant, Jack Harris Transportation, Inc., is an Illinois Corporation ("Jack Harris"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, Jack Harris contracted to provide bus services for Defendant Board.

17.     Defendant, JL Harris Transportation, Inc., is an Illinois Corporation ("JL Harris"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, JL Harris contracted to provide bus services for Defendant Board.

18.     Defendant, Latino Express, Inc., is an Illinois Corporation ("Latino Express"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, Latino Express contracted to provide bus services for Defendant Board.

19.     Defendant, Ransom Bus Company, is an Illinois Corporation ("Ransom"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, Ransom contracted to provide bus services for Defendant Board.

20.     Defendant, R&D Bus Company, is an Illinois Corporation ("R&D"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, R&D contracted to provide bus services for Defendant Board.

21.     Defendant, Sunrise Transportation, Inc., is an Illinois Corporation ("Sunrise"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, Sunrise contracted to provide bus services for Defendant Board.

22.     Defendant, United "Quick" Transportation, Inc., is an Illinois Corporation ("United Quick"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, United Quick contracted to provide bus services for Defendant Board.

23.     Defendant, Walls Transportation, Inc., is an Illinois Corporation ("Walls"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, Walls contracted to provide bus services for Defendant Board.

24.     Defendant, First Student, Inc. is a Florida Corporation ("First Student"), with its principal place of business in Cincinnati, Ohio. From May 2013 to present, First Student contracted to provide bus services for Defendant Board.

25.     Defendant, Chicago School Transit, Inc. is an Illinois Corporation ("CST"), with its principal place of business in Chicago, Illinois.  From May 2013 to present, CST contracted to provide bus services for Defendant CST.

26.     The Defendants, other than the Board, will be referred to herein collectively as "Vendors" or "The Vendors."

## III. JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

28.     This Court has supplemental jurisdiction over the *qui tam* Relator's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they are part of the same case and controversy under Article III of the United States Constitution. This Court also has jurisdiction over the state's claims pursuant to 31 U.S.C. § 3732(b), as the state's claims arise from the same transactions and occurrences as the federal action.

29.     This Court has personal jurisdiction over all Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Defendants transact business in the United States. All Defendants can be found in, reside in, and/or transact or have transacted business related to the allegations in this complaint within the Northern District of Illinois.

30.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), as the Defendants can be found in, reside in, and/or transact business in the Northern District of Illinois.

## IV. THE FEDERAL FALSE CLAIMS ACT

31.     The Federal False Claims Act provides, in pertinent part that:

(1) In general. Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United State Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person,

\*       \*       \*

(b) For purposes of this section, the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729

(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.  The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure.  The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.  The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal . . .

31 U.S.C. § 3730.

## V.    THE ILLINOIS FALSE CLAIMS ACT

32.    The Illinois False Claims Act provides, in pertinent part:

(a) Liability for certain acts. (1) In general, any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the State and knowingly delivers, or causes to be delivered, less than all the money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the State, or a member of the Guard, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State,

is liable to the State for a civil penalty of not less than the minimum amount and not more than the maximum amount allowed for a civil penalty for a violation of the federal False Claims Act (31 U.S.C. 3729 et seq.) as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461) plus 3 times the amount of damages which the State sustains because of the act of that person. Notwithstanding any other provision, a person is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person, when: (i) the civil action was brought by a private person pursuant to paragraph (1) of subsection (b) of Section 4; (ii) the State did not elect to intervene pursuant to paragraph (2)

of subsection (b) of Section 4; (iii) the actual amount of the tax owed to the State is equal to or less than $50,000, which does not include interest, penalties, attorney's fees, costs, or any other amounts owed or paid pursuant to this Act; and (iv) the violation of this Act relates to or involves a false claim regarding a tax administered by the Department of Revenue, excluding claims, records, or statements made under the Property Tax Code. . . .

\*    \*    \*

(1) The terms "knowing" and "knowingly" (A) mean that a person, with respect to information:

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance to the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information, and

(B) require no proof of specific intent to defraud.

740 ILCS §175/3

(b) Actions by private persons. (1) A person may bring a civil action for a violation of Section 3 [740 ILCS §175/3] for the person and for the State. The action shall be brought in the name of the State. . . .

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the State. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. . . .

(3) The State may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. . . .

740 ILCS §175/4

## VI.    DEFENDANTS' KNOWING SUBMISSION OF FALSE CLAIMS

### A.    Medicaid Funding for Special Education Transportation

33.    Medicaid, created by Congress in 1965 (*see* 42 U.S.C. §§ 1396-1396v), is a public-assistance program that pays for expenses incurred by and for low-income individuals.  The Medicaid program pays for services pursuant to plans developed by the states and approved by the

U.S. Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). Medicaid covers the cost of transportation to and from school for children with specialized transportation needs identified in their Individualized Education Plan on days when they receive a medical service in school.

34.    Programs that are funded by the Medicaid Program, including special needs transportation programs, must certify that they have furnished or caused to be furnished, the care, services and supplies itemized in claims that they bill to Medicaid and that the services were provided in accordance with applicable federal and state laws and regulations.

35.    Funding for transportation for special needs students is provided by state and federal Medicaid programs.

**B.    Defendants' Illegal Inducement Scheme**

36.    The Vendors' illegal inducement scheme included: (1) price fixing; (2) submitting invoices to the Board based on false ridership data to support charges for special needs transportation services never provided; (3) purposefully failing to properly install GPS trackers or disabling GPS capability designed to verify ridership data and to conceal inactivity while still charging for planned – but unprovided – special needs transportation services to facilitate submission of false invoices; (4) disabling video camera systems designed to verify ridership data and to conceal inactivity while still charging for planned – but unprovided – special needs transportation services to facilitate submission of false invoices; (5) charging for special needs transportation services not provided for; and (6) certifying reimbursement requests for transportation services not rendered.

37.    Vendors have been knowingly submitting false claims for payment for services not rendered, and agents and/or employees of the Board were complicit in approving and certifying

the overcharges based on fixed prices and/or inflated bus usage data for services not rendered by the Vendors in order to maximize reimbursement from Medicaid.

38.     The Board was complicit in the Vendors' illegal inducement scheme by certifying and submitting false claims for reimbursement to Medicaid which were based on payments made on invoices the Board knew to be based on fixed pricing, inflated bus usage data, and inflated ridership.

C.     **Background for Illegal Inducement Scheme**

39.     Transportation services for Chicago Public Schools are and have been provided by private bus vendors.

40.     From July 2013 to present, a bus "run" included the individual point-to-point service provided within the larger "route." In the morning, a run consisted of special needs student pickups at designated locations and dropping students off at their school. An afternoon run included picking special needs students up at the end of the school day from their schools, and dropping them off at designated locations.

41.     From July 2013 to present, a bus "route" was the total travel by a bus on a school day.

42.     At all relevant times, Special Needs routes (routes run by buses carrying special needs students) made up 70% of Chicago Public Schools student transportation services.

43.     From May 2012 through January 2016, Paul Osland was the Executive Director of the Transportation Department of Chicago Public Schools. On multiple occasions during this time period, Paul Osland told Jeffrey Hubert that STS received $130 million per year in block grants and Medicaid from the Governments for transporting Special Needs students. Osland has stated

in relationship to these claims that STS was the only department in CPS that actually generated a profit.

44.     From 2008-2013, compensation from the Board to Vendors was provided as a flat rate for a single route, and an additional charge for a paired route (approximately $265 for a first run, and $140 for a second run).

45.     By April 21, 2013, the Board had instituted a Request for Proposal ("RFP" or "2013 RFP") Process for awarding contracts for yellow bus services. The 2013 RFP called for the Vendors to compete for contracts for yellow bus services by individually submitting bids to the Board. Compensation to the Vendors following the 2013 RFP would be provided on a flat rate per bus, per day, plus a per mile fee for single routes. For paired routes (two schools serviced by one bus), compensation would be provided on a flat rate per bus, per day, plus a per mile fee for the first route and on mileage alone for the second route. The process was ostensibly intended to drive prices for yellow bus services down. The compensation structure can be illustrated as follows (**Figure 1**):



**FIGURE 1**

14

46.     In preparation for the 2013 RFP, the Board retained AT Kearney, a consulting firm. Consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, informed the Board and Jeff Hubert that the "should-be" – fair market price – for a first route was $212.

47.     Following the 2013 RFP and after contracts had been awarded to bidders (Vendors), monthly invoices for services based on planned route information would be generated by the Board, and would be sent to the Vendor. The Vendor would then make adjustments and return the invoice to the Board, ostensibly based on services actually provided.  The Vendor adjustments would be made in the Board's system, then the invoice would be reissued for Vendor approval. After Vendor approval, the Board would issue payment.

**D.      Vendor Collusion to Fix Prices for Bus Services at Anti-Competitively High Levels and the Board's Knowledge of the Vendors' Scheme**

48.     Via the use of a Contractors' Association, which included as members Falcon, Ammons, AM Bus, Caravan, R.D. Bus, Dunbar, O'Neal's, Illinois Student, White Transportation, Ransom, Walls, J.L. Harris, Jack Harris, Alltown, Latino Express, United Quick, Illinois Central, Jewel's Bus Company, and Sunrise, Vendors conspired to fix prices for bus services at anti-competitively high levels.  The members of the Contractors' Association met regularly leading up to and during the 2013 RFP to discuss and agree upon pricing.

49.     Paul Osland, Executive Director of Student Transportation Services from May 2012 through January 2016, admitted under oath that he knew Vendors were members of a Contractors' Association.  Paul Osland testified that in 2012 he met with the members of the Association, and that he understood the association to be a "vendor group" that would represent the needs and interests of the "vendor group." Specifically, Paul Osland further testified he met with Shun Ammons (Ammons Transportation), Ed Peterson (Falcon Transportation), Greg

Bonnett (Sunrise), and Greg Polan (Alltown), who Paul Osland understood to be the leadership of the association. Osland also knew of their collective effort to fix prices for yellow bus services.

50.     In a Summer 2013 meeting in Jeffrey Hubert's home, Paul Losos and Greg Bonnett (owners of Sunrise), complained to Jeff Hubert that during the 2013 RFP the Board tried to pit vendors against each other and that the Vendors were not going to let that happen.  Losos and Bonnett further confirmed to Jeff Hubert that rather than compete with each other based on price for service contracts, the Vendors simply met with each other to discuss and agree upon pricing. Losos and Bonnett further confirmed to Jeff Hubert that the bidding process in the 2013 RFP was collusive and that Vendors had communicated with each other and agreed to submit fixed pricing. In August 2013, Hubert told Osland of the conversation.

51.     Individual Vendor bids in the 2013 RFP were remarkable. Contractors' Association members Falcon, Ammons, AM Bus, Caravan, R.D. Bus, Illinois Student, Alltown, Latino Express, United Quick, Illinois Central, Sunrise, and First Student included an identical 22-mile minimum mileage component in each of their opening bids. Such a requirement was not called for by the 2013 RFP.

52.     In the 2013 RFP's opening round of bids, 11 known members of the Contractors Association, in what was supposed to be a competitive and independent bidding process, submitted bids for first route rates within $17 of one another, and were all well above the fair market price of $212:

- Alltown:             $294
- A.M. Bus:            $289
- Ammons:             $277
- Caravan:             $289
- Falcon:              $289
- Illinois Student:    $288
- Latino Express:      $288
- Ransom:             $285

- R&D Bus: $291
- Sunrise: $291
- First Student: $285

53. First Student, who had never been awarded yellow bus contracts with the Board before the 2013 RFP, included an identical 22-mile minimum mileage component and an opening bid $73 above the $212 "should-be" competitive price identified by AT Kearney.

54. On August 22, 2013, Paul Osland, Executive Director of Student Transportation, confirmed that "targets" were provided to the vendors during the 2013 RFP.

55. Paul Osland is now the COO of First Student, a vendor that was awarded a contract in the 2013 RFP and which continues to hold contracts for yellow bus services with the Board and the City of Chicago.

### E. Background on Vendor Efforts to Interfere with Global Positioning System Tracking of the Yellow Bus Fleet to Impede Verification of Services Actually Provided and the Board's Knowledge of This Scheme

56. Vendor buses were outfitted with Global Positioning Systems (GPS) that record the actual activity of Vendor buses. GPS is maintained on the Board's servers and, when compared to planned routes, confirms that Vendors submitted claims to the Board for services not provided, including billing for bus routes that were not run. In his capacity as a Board employee, Hubert viewed data, including on-time performance reports, bus out of service reports, and GPS location reports that confirmed buses which were billed for but did not actually run. Because this information is stored on the Board's servers, Jeffrey Hubert does not have access to it without discovery.

57. GPS was intended to be used by the Board to verify claims submitted by Vendors to the Board for payment. However, Vendors intentionally inputted incorrect route information to render buses invisible for purposes of GPS tracking.

58.     William Harris, a Board employee and GPS Super User, informed Jeff Hubert that GPS data retention was set at 90 days, restricting the ability to compare GPS data with invoices submitted by the Vendors. Harris copied Paul Osland on an email requesting an explanation for who instructed Zonar, the GPS tracking device vendor, to retain GPS data for only 90 days, as documented in a January 6, 2014 email to Toby McGraw (Zonar), Paul Osland, Jeffrey Hubert, and Mason Danner (Zonar).  Harris further documented that a Zonar tech confirmed that 90 days was a specifically requested setting. (*See* January 6, 2014 email correspondence with subject line "GTC Data retention" attached as **Exhibit A**). Only the Board or Vendors could have requested such a setting.

59.     The Board employed vendor managers, including Megan Wilson and Kristen Lausman.  Their duties included managing the Board's relationship with Vendors and managing Vendor conduct. Their duties also included reviewing invoices submitted to the Board by Vendors for correctness, and ensuring that each invoice was verified by GPS so that the Board did not pay for services not provided.  Invoices approved by vendor managers after GPS verification were in turn approved for payment by the billing manager. From 2008-2012, the billing manager was Oscar Pena. From 2013-2015, the billing manager was Tom Jahnke.

60.     Former vendor manager Megan Wilson acknowledged under oath that not having visibility through GPS of the bus fleet presented many challenges, one of which would be the ability to verify that a vehicle operated through the GPS system. This lack of GPS visibility permitted Vendors to purposefully overbill the Board for services not performed, including buses that did not run.

61.     Data pulled from these invoices was used to support reimbursement requests from the Governments by Data Analyst, Julie Mansbacher.  A July 30, 2014 email from Paul Osland to

Markay Winston, Lachlan Tidmarsh, Ginger Ostro, John Barker, Phillip DiBartolo, Lynne Moore Nelson, Jeffrey Hubert, and Julie Mansbacher (all Board employees), confirmed that Julie Mansbacher was "the lead" on a project to provide information to the Illinois State Board of Education to justify "the approximately $400 [million] in state grants" used to "support" Office of Diverse Learner Supports and Services and Transportation work. (*See* July 30, 2014 email correspondence with subject line "Re: ISBE Block Grant Claims" attached as **Exhibit B**).

62.     On October 8, 2013, following implementation of Zonar GPS trackers on Vendor buses, Greg Bonnett (Sunrise) sent an email to representatives of the following vendors: Falcon, Ammons, AM Bus, Caravan, R.D. Bus, O'Neal's, Illinois Student, Dunbar, White Transportation, Ransom, Walls, Jack Harris, JL Harris, Alltown, Latino Express, United Quick, Illinois Central, Jewel's Bus Company, and Sunrise Bus. The email details conversations among representatives of the above-referenced Vendors related to the implementation of Zonar GPS. Specifically, Vendors contended that "Zonar should never be tied to our billing." Functioning GPS trackers would make all of their vehicles trackable and the mileage ultimately billed to the Board verifiable. This would impede Vendors' efforts to overbill the Board. (*See* October 8, 2013 email correspondence with subject line "RE: Zonar Issues" attached as **Exhibit C**). Jeff Hubert provided a hard copy of the October 8, 2013 email to Paul Osland.

63.     Vendors would also perpetrate fraud by entering incorrect route inputs into the bus' Zonar GPS. As documented in an October 15, 2014 email from William Harris to the routing team:

> Still the same culprits. . . CST, Illinois Central, and Jack Harris. . . .can CST, Illinois Central, and Jack Harris receive LDs for invalid route inputs? It appears as if they are still having chronic issues, despite receiving feedback from us everyday [sic] last week in regards [sic] to invalid route inputs. On the attached spreadsheet, I have highlighted the inputs I think are liquidatable, these don't include situations where it appears the input was 'fat fingered' or it appears as if the driver was having a

'dyslexic moment.' (*See* October 14, 2014 email correspondence with subject line "Incorrect Route Input" attached as **Exhibit D**).

64. An October 16, 2014 email from William Harris to the STS Routing Team documents that "the saga continues" and provides 1,317 routes where vendors entered incorrect route input, rendering 1,317 buses effectively untrackable for purposes of billing verification. *Id.*

65. On October 18, 2014, Chris Toczycki, a technology consultant with the Board, identified 1,077 non-riders in the system. The non-riders in the system were used by Vendors to justify billing for more buses than were needed and buses which did not run. The non-riders in the system also inflated ridership numbers the Board used to support claims for reimbursement to the state and federal Medicaid programs.

**F.      Vendors' Internal Routing Structures and Creation of Fraudulent Routes to Facilitate Submission of False Claims, and the Board's Knowledge of Vendors' Conduct**

66. The Vendors developed internal route structures which identified bus stops that Vendors did not need to make because the students who were planned to be picked up at those stops did not require bus services, were opting to get to school using transportation other than a bus, or otherwise opted not to use bus services. Following Vendors' instructions, bus drivers would skip these stops altogether, thus reducing the actual number of miles driven on the particular run. However, Vendors would still submit an invoice to the Board for the planned mileage of the run, which was longer than the actual run. The Vendors' respective internal route structures are within the exclusive control of the Defendants; Jeffrey Hubert does not have access to this evidence without a reasonable opportunity for further discovery.

67. One such example of a vendor using internal efficiencies without notifying the Board occurred on September 2, 2014, involving Board employee William Harris, which was

20

documented in email correspondence with subject line "Event at A.M. Bus this morning" attached as **Exhibit E.**

68.     According to **Exhibit E**, on September 2, 2014, Mr. Harris arrived at A.M. Bus' bus yard at approximately 5:40 a.m. to observe buses leaving for timeliness, to see if any drivers were having issues with pre-trip inspections, and to observe interactions with bus aide staff.  Harris saw that one of A.M. Bus' managers, "Aaron," had a detailed route structure sheet that included Route Number, Runs, Driver Name, Run Start Time, and whether a CPS aide was required.  *Id.* Harris obtained the document and compared it to the route structure sheet generated by the Board, and noticed inconsistencies. *Id.* The A.M. Bus document had a more accurate route structure.  *Id.* "Aaron" and another A.M. Bus employee, "Eddie" agreed that the Board and A.M. Bus were working from two different sets of information. *Id.* Moments after this agreement, Pamela Williams from A.M. Bus took the report from Harris and stated that he "shouldn't have this copy" and that it contained "their internal routes." *Id.* Pamela Williams also confirmed that Harris as a representative of the Board was not supposed to have the copy documenting "internal routes."  *Id.* The most likely reason a Vendor would not share its route structure with the Board is that the route would not match the Board's planned route, which would provide evidence to the Board that a route was not run, though it was billed for.  Despite this knowledge, which Harris immediately reported to Hubert via email dated September 2, 2014, and which was shared with Paul Osland, the Board took no action.  *Id*.

69.     Vendors also were able to manipulate the Board's own internal route information. The Board used bus routing and planning software, "Edulog," to detail Vendors' respective bus routes. Despite Vendors' routes being pre-determined by the Board, Vendors had access to edit (planned) runs and routes on Edulog via the use of "Run Editor." Vendors used Run Editor to re-

order their (planned) Edulog runs and routes to fraudulently maximize mileage for paired routes. Though Relator does not have access to monthly Edulog run and route detail for every run and route allegedly run by each vendor without formal discovery, one representative example was Defendant Sunrise's fraudulent billing for its bus routes to and from Wilma Rudolph Elementary Learning Center ("Rudolph Elementary"), a special education institution on Chicago's near west side, in September 2014.

70.     In September 2014, Sunrise ran a paired route (so the second route was billed using mileage only) which transported CPS special needs students to and from Rudolph Elementary at 110 North Paulina Street in Chicago.  In the afternoon, the planned route's first stop was less than one half mile from Rudolph Elementary, and the last stop was at approximately the 4000 block of South Lake Shore Drive.  Thus, the planned afternoon route to get students home from school was approximately 10 miles.  The planned morning route ran in the same order, but in the opposite direction.

71.     Sunrise used Run Editor (CPS route planning software) to reverse the stop order. By completely reversing the stop order, the pre-determined 20-mile run (10 miles in the morning, and 10 miles in the afternoon), became a 40-mile run. Following Sunrise's route re-ordering in Run Editor, the Board paid Sunrise for a 40 mile run that was only supposed to be 20 miles. (*See* October 3, 2014 email correspondence from Paul Osland to Greg Bonnet with subject line "Re: Several Items" attached as **Exhibit F**).

72.     Sunrise's conduct was not unique. Vendors would maximize per mile fraudulent billing on runs by reversing and/or manipulating the stop order in Edulog with Run Editor. For example, a planned run ordered "Stop 1, Stop 2, Stop 3, Stop 4, Stop 5" in Edulog would be

reversed and/or manipulated by Vendors to maximize mileage. This fraudulent conduct can be illustrated as follows (**Figure 2**):



73.     Relator personally observed dozens of reversed and manipulated run map illustrations in Edulog in April 2014. Relator does not have access to the monthly Edulog run and route detail for every run and route allegedly run by each vendor in April 2014 without a reasonable opportunity for further discovery.

74.     Beginning in April 2014, Jeffrey Hubert ordered a full audit of all 1,800 routes. Board employee Jennifer Hanson discovered a number of runs operated by Caravan Transportation that were being overbilled:

   a.  Caravan was billing run 2800.152 at 15.16 miles, when it should have been 12.16 miles.

   b.  Caravan was billing run 5070.051 at 16.31 miles, when it should have been 7.7 miles.

   c.  Caravan was billing run 5070.151 at 19.88 miles, when it should have been 7.89 miles.

   d.  Caravan was billing run 5070.152 at 14.56 miles, when it should have been 13.35 miles.

   e.  Caravan was billing run 5140.551 at 14.98 miles, when it should have been 11.39 miles.[1]

   (*See* April 23, 2014 email correspondence with subject line "Re: Caravan Inflated Mileage: Cleveland, Nettelhorst, West Park" attached as **Exhibit G**).

75.     Despite this evidence of inflated miles and overbilling, Paul Osland ordered Jeffrey Hubert to stop the audit.

---

[1] It is Relator's observation that this overbilling for services not provided was systemic, occurring on a regular basis.

## VII.    SPECIFIC INSTANCES OF FRAUDULENT CONDUCT

### A.    The Board's Fraudulent Conduct

76.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

### i.    Fraudulent Conduct Before and During the 2013 RFP

77.    The Board knowingly acquiesced to artificially inflated prices by awarding contracts based on prices it knew to be anti-competitively high and based on collusion, then submitted reimbursement claims to the Governments using pricing it knew to be false and anti-competitively high. The Board further acquiesced to using inflated ridership data to support reimbursement requests.

78.    During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

79.    In total, thirteen vendors, Illinois Central, United Quick, Latino Express, Alltown, Ransom, Sunrise, A.M. Bus, Ammons, Falcon, Caravan, Illinois Student, R&D Bus, and First Student, without invitation from the Board, negotiated exactly a 22-mile minimum into their contracts, regardless of the actual length of the route.  No vendor attempted to obtain a mileage minimum of any other length.  This was an obvious indication to the Board that these thirteen vendors, all but one of whom were known members of the Contractors' Association, had communicated about and agreed upon pricing.  Nevertheless, the Board did not seek to determine whether the bids were the result of an agreement.  Instead, the Board knowingly awarded contracts to these Vendors at artificially-inflated prices.

80.    In March 2013, Paul Osland told Jeff Hubert that "if we disqualified every vendor that stole from CPS over the last five years, we wouldn't have any vendors left." On numerous

occasions, Paul Osland described Student Transportation Services as a "profit center" to Jeff Hubert. In light of Paul Osland's knowledge that contracts were awarded at artificially high prices, along with his knowledge that claims based on these artificially high prices would be submitted to the government for reimbursement, Osland had knowledge of the fraud taking place.

81.     Paul Osland is now the COO of First Student which was a vendor he managed in his capacity as Executive Director of the Student Transportation Services department and a vendor that now holds numerous contracts with the Board and other departments within the City of Chicago.  Other former Board employees involved in managing yellow bus transportation who now work for First Student include former Vendor Manager Megan Wilson and Leslie Norgren.

82.     On April 13, 2013, Jeffrey Hubert met with Greg Polan and Tom Vorndran (CFO) of Alltown to discuss the Transportation Services Contract and the proposed liquidated damages provisions which were to be included in that contract.  Polan and Vorndran complained that the proposed liquidated damages were draconian. Polan stated that if the Board insisted on putting them in the contract, then all the vendors were going to have to build anticipated liquidated damages into their bid prices. Vorndran then stated, "yea, like we did in the 2008 contract." When Hubert asked Vorndran how much Alltown had built into their rates to account for liquidated damages, Vorndran stated that it was $2,333 per bus.

83.     On April 13, 2013, Jeffrey Hubert told Paul Osland that Greg Polan and Tom Vorndran admitted to building anticipated liquidated damages into bid prices and dramatic overbilling by Alltown and other vendors. Paul Osland told Hubert he did not believe him.

        **ii.     Fraudulent Conduct After the 2013 RFP**

84.     Hubert also confirmed the conversation he had with Alltown representatives in a May 13, 2014 email:

> Coupled with the fact that Alltown has built $500k annually into their prices for anticipated liquidated damages (an amount that has not yet been met) the fact that they know their non-compliance was intentional, and the disincentive to sue your customer in the first year of a contract, my guess is that they will not go beyond the CAO remedy. (*See* May 13, 2014 email correspondence with subject line "Re: follow up" attached as **Exhibit H**).

85.     The $500,000.00 over charge was billed at approximately $2,333 per bus, per month. On December 11, 2013, Paul Osland told Jeff Hubert that Osland was aware of Vendors having agreed to build $2,333 per bus into their bids, but dismissed the collusion as a "cost of doing business."

86.     On February 4, 2014, Paul Osland confirmed in an email to Tim Cawley, Chief Administrative Officer of CPS, that "I am telling you . . . a very interesting group of vendors. They talk like crazy, share lawyers, business advisers, etc. Some are very manipulative . . ." (*See* February 4, 2014 email correspondence with subject line "Re: Upcoming Supplier Reviews" attached as **Exhibit I**). Tim Cawley reported directly to Barbara Byrd-Bennett, then-CEO of CPS.

87.     In April 23, 2014 correspondence from Paul Osland to Alltown, Osland outlines Alltown's refusal to comply with contractual requirements to install and operate video cameras, which were a way to verify the accuracy of invoices.  Osland stated that, "beginning on October 1, 2013, Alltown – in contravention of its obligations – failed to record driver areas and step wells on 225 buses. . . . Alltown's buses remained non-compliant for 89 days." (*See* April 23, 2014 correspondence with subject line "Alltown's non-compliance in recording driver areas and step wells on buses" attached as **Exhibit J**). Despite Osland's confirmation that Alltown failed to provide contracted-for services, he refused to assess liquidated damages and reversed a large liquidated damages assessment Hubert levied against Alltown arising from the same failure to provide contracted-for services.

88.　　Invoices submitted with fraudulent overcharges were submitted monthly by each Vendor, and approved by Board employees including but not limited to Megan Wilson, Kristen Lausman, Francisco DuPrey, Oscar Pena, and Tom Jahnke.

89.　　In July 2014, Jeff Hubert instructed Board employee Liz Perkins to conduct a physical audit (Perkins observing students entering and exiting buses) of Vendors providing summer school busing services.

90.　　From July 21 to July 23, 2014, Liz Perkins' physical audit of Sunrise revealed that Sunrise was picking up significantly less summer school riders than planned. (See "Ridership EdulogRuns_20140721" attached as **Exhibit K**). For instance:

   a. On July 23, 2014, Sunrise run 2480.052 called for transport of 7 riders to Burnham Math & Science Academy. The bus assigned to that route transported 1 rider.

   b. On July 23, 2014, Sunrise run 2480.056 called for transport of 8 riders to Burnham Math & Science Academy. The bus assigned to that route transported 3 riders.

   c. On July 23, 2014, Sunrise run 1790.052 called for transport of 10 riders to Chicago High School for Agricultural Sciences. The bus assigned to that route transported 2 riders.

91.　　From July 21 to July 23, 2014, Liz Perkins' physical audit of Alltown revealed that Alltown was picking up significantly less summer school riders than planned. (**Ex. K**). For instance:

   a. On July 21, 2014, Alltown run 3100.151 called for it to transport 9 riders to John B. Drake Elementary School. The bus assigned to that route transported 3 riders.

   b. On July 21, 2014, Alltown run 3100.152 called for transport of 12 riders to John B. Drake Elementary School. The bus assigned to that route transported 3 riders.

   c. On July 22, 2014, Alltown run 5600.160 called for transport of 11 riders to Reinberg Elementary School. The bus assigned to that route transported 4 riders.

92.　　The Board knowingly submitted requests to the Governments based on this inflated ridership to maximize Medicaid reimbursement.

**B.      Alltown Bus' Fraudulent Conduct**

93.      Relator repeats and realleges each and every allegation contained as if fully set forth herein.

**i.      Fraudulent Conduct Before and During the 2013 RFP**

94.      During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

95.      For the 2013 RFP, Alltown, a known member of the Contractors' Association, bid $294 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. Alltown's bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

96.      Without invitation from the Board, Alltown negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

97.      Every monthly invoice submitted for transportation services at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

**ii.      Representative Examples of Billing for Services Not Provided**

98.      Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

99.    On April 22, 2014, Defendant Alltown was to transport students to Belmont-Cragin Elementary School on bus "AL7609," run 3390.051. Alltown bus AL7609 never completed this run. (*See* "Chicago_4.22.14" Report attached as **Exhibit L** at line 797). Nonetheless, Alltown billed the Board for this run which was not performed.

100.    For the April 2014 billing cycle, Alltown billed CPS for special needs transportation services not provided, including, but not limited to, up to 27 runs it purported to complete on April 22, 2014. (**Ex. L**).

101.    In April 23, 2014 correspondence from Paul Osland to Alltown, Osland outlines Alltown's refusal to comply with contractual requirements to install and operate video cameras, which were a way to verify the accuracy of invoices.  Osland stated that, "beginning on October 1, 2013, Alltown – in contravention of its obligations – failed to record driver areas and step wells on 225 buses. . . . Alltown's buses remained non-compliant for 89 days." (**Ex. J**).

102.    In July 2014, Jeff Hubert instructed Board employee Liz Perkins to conduct a physical audit (Perkins observing students entering and exiting buses) of Vendors providing summer school busing services.

103.    From July 21 to July 23, 2014, Liz Perkins' physical audit of Alltown revealed that Alltown was picking up significantly less summer school riders than planned. (**Ex. K**). For instance:

      a.    On July 21, 2014, Alltown run 3100.151 called for it to transport 9 riders to John B. Drake Elementary School. The bus assigned to that route transported 3 riders.

      b.    On July 21, 2014, Alltown run 3100.152 called for transport of 12 riders to John B. Drake Elementary School. The bus assigned to that route transported 3 riders.

      c.    On July 22, 2014, Alltown run 5600.160 called for transport of 11 riders to Reinberg Elementary School. The bus assigned to that route transported 4 riders.

104. Alltown used inflated ridership numbers like these to justify unnecessary additional buses, which it then billed to the Board monthly.

### C. A.M. Bus Company

105. Relator repeats and realleges each and every allegation contained as if fully set forth herein.

#### i. Fraudulent Conduct Before and During the 2013 RFP

106. During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

107. For the 2013 RFP, A.M. Bus, a known member of the Contractors' Association, bid $289 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. A.M. Bus' bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

108. Without invitation from the Board, A.M. Bus negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

109. Every monthly invoice submitted for transportation services at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

#### ii. Representative Examples of Billing for Services Not Provided

110. Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one

such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

111.    On April 22, 2014, Defendant A.M. Bus was to transport students from Parker Community Academy and Parker Child Parent Center on bus "AM876," run 5270.152. A.M. Bus AM876 never completed this run. (*See* **Ex. L**, at line 7522). Nonetheless, A.M. Bus billed the Board for this run which was not performed.

112.    For the April 2014 billing cycle, A.M. Bus billed CPS for special needs transportation services not provided, including, but not limited to, up to 32 runs it purported to complete on April 22, 2014. (**Ex. L**).

**D.    Ammons' Fraudulent Conduct**

113.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

### i.    Fraudulent Conduct Before and During the 2013 RFP

114.    During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

115.    For the 2013 RFP, Ammons, a known member of the Contractors' Association, bid $277 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. Ammons's bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

116.    Without invitation from the Board, Ammons negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

117.    Ammons was a known member of the Contractors' Association.  Shaun Ammons was the President of the Contractors' Association in 2013.

118.    Every monthly invoice submitted for transportation at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

119.    From February 16, 2013 to February 23, 2013, Jeffrey Hubert and his staff conducted a fleet audit that included an audit of 39 Ammons buses.  Ammons had been awarded a contract that called for 20 buses.  They had been billing for 22 buses.  Each of these buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

**ii.      Representative Example of Billing for Services Not Provided**

120.    Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below.

121.    On April 22, 2014, Defendant Ammons was to transport students to Lenart Elementary Regional Gifted Center on bus "AT125," run 7240.007. Ammons bus AT125 did not complete this run. (*See* **Ex. L,** at line 5770). Nonetheless, Ammons billed the Board for this run which was not performed.

122.    For the April 2014 billing cycle, Ammons billed CPS for special needs transportation services not provided, including, but not limited to, up to 4 runs it purported to complete on April 22, 2014. (**Ex. L**).

E.    **Caravan's Fraudulent Conduct**

123.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

i.    **Fraudulent Conduct Before and During the 2013 RFP**

124.    During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

125.    For the 2013 RFP, Caravan, a known member of the Contractors' Association, bid $289 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. Caravan's bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

126.    Without invitation from the Board, Caravan negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

127.    Every monthly invoice submitted at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

ii.    **Representative Examples of Billing for Services Not Provided**

128.    From February 16, 2013 to February 23, 2013, Jeffrey Hubert and his staff conducted a fleet audit that included an audit of 53 Caravan buses. Caravan had been awarded a contract that called for 41 buses. They had been billing for 48 buses. Each of these buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

129.    In April 2014, Jeffrey Hubert ordered a full audit of the approximately 1,800 runs. After a review of Caravan Transportation, Board employee Jennifer Hanson discovered that

Caravan had been inflating mileage for its second runs, which were compensated purely on a mileage basis. For instance:

    a.   Caravan was billing run 2800.152 at 15.16 miles, when it should have been 12.16 miles.

    b.   Caravan was billing run 5070.051 at 16.31 miles, when it should have been 7.7 miles.

    c.   Caravan was billing run 5070.151 at 19.88 miles, when it should have been 7.89 miles.

    d.   Caravan was billing run 5070.152 at 14.56 miles, when it should have been 13.35 miles.

    e.   Caravan was billing run 5140.551 at 14.98 miles, when it should have been 11.39 miles (**Ex. G**).

130.    Despite this clear evidence of overbilling, Paul Osland ordered Hubert to stop conducting fleet audits, and thus obstructed Hubert's efforts to uncover additional instances of overbilling.

131.    Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

132.    On April 22, 2014, Defendant Caravan was to transport students to Hamilton Elementary School on bus "C89," run 3730.051. Caravan bus C89 did not complete this run. (*See* **Ex. L**, at line 4230). Nonetheless, Caravan billed the Board for this run which was not performed.

133.    For the April 2014 billing cycle, Caravan billed CPS for special needs transportation services not provided, including, but not limited to, up to 6 runs it purported to complete on April 22, 2014. (**Ex. L**).

F.      **Falcon's Fraudulent Conduct**

134.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

i.      **Fraudulent Conduct Before and During the 2013 RFP**

135.    During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

136.    For the 2013 RFP, Falcon, a known member of the Contractors' Association, bid $289 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. Falcon's bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

137.    Without invitation from the Board, Falcon negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

138.    Ed Peterson, the president of the Contractors' Association, was the self-proclaimed "godfather" of the Contractors' Association.

36

### ii.    Fraudulent and Collusive Conduct Following the 2013 RFP

139.    On October 9, 2013, Ed Peterson stated to Jeff Hubert, "you don't really expect the vendors to tell you who the ghost riders are, do you?"   Peterson's statement confirmed his awareness of the fact that Falcon and other Vendors were billing for services not performed.

140.    On November 21, 2013, Ed Peterson sent email correspondence to Paul Osland wherein he detailed the influence the "contractors assn" has in reaching "constructive solutions" to "common transportation problems," while noting that "radicals" like "Alltown and Sunrise" are not "board members" and "would not drive the group. . . [though] their input is important, but they are one 1 vote each." (*See* November 21, 2013 email correspondence with subject line "Re: Letter" attached as **Exhibit M**).  Peterson goes on to explain that the more the Board enforces the contract, including assessing liquidated damages for vendors' failure to provide services contracted for, "will negatively unify those impacted."   Peterson references an invitation to "join the fight" apparently already underway from cooperating unnamed members of the Contractors' Association.  Peterson also appears to counsel Osland that previous STS management personnel have been aware of the Contractors' Association and that "other past STS brass have used it effectively."  Peterson also states that he attempted to convince other members of the Association that "past STS admins were tough starting out too then eased somewhat in the future, and that may be the case here."  Peterson's email correspondence that members of the Contractors' Association worked collectively to serve their own interests, which included overbilling the Board.

141.    Every monthly invoice submitted at the artificially high prices set as a result of the agreement and anticompetitive cooperation of the Contractors' Association was fraudulent, as it was the result of collusion and other anticompetitive activity.

### iii. Representative Examples of Billing for Services Not Provided

142.     From February 16, 2013 to February 23, 2013, Jeffrey Hubert and his staff conducted a fleet audit that included an audit of 87 Falcon buses.  Falcon had been awarded a contract that called for 74 buses.  They had been billing for 90 buses.  Each of these buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

143.     Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

144.     On April 22, 2014, Defendant Falcon was to transport students to Agassiz Elementary School on bus "F32," run 2030.051. Falcon bus F32 did not complete this run. (*See* **Ex. L** at line 82). Nonetheless, Falcon billed the Board for this run which was not performed.

145.     For the April 2014 billing cycle, Falcon billed CPS for special needs transportation services not provided, including, but not limited to, up to 18 runs it purported to complete on April 22, 2014. (**Ex. L**).

### G.     Illinois Student's Fraudulent Conduct

146.     Relator repeats and realleges each and every allegation contained as if fully set forth herein.

### i.     Fraudulent Conduct Before and During the 2013 RFP

147.     During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

148.    For the 2013 RFP, Illinois Student, a known member of the Contractors' Association, bid $288 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. Illinois Student's bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

149.    Without invitation from the Board, Illinois Student negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

150.    Every monthly invoice submitted at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

### ii.    Representative Examples of Billing for Services Not Provided

151.    From February 16, 2013 to February 23, 2013, Jeffrey Hubert and his staff conducted a fleet audit that included an audit of 43 Illinois Student buses.  Illinois Student had been awarded a contract that called for 32 buses.  They had been billing for 47 buses.  Each of these buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

152.    Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

153.    On April 22, 2014, Defendant Illinois Student was to transport students to North River Elementary School on bus "IS31," run 7890.052. Illinois Student bus IS31 did not complete

this run. (*See* **Ex. L** at line 7002). Nonetheless, Illinois Central billed the Board for this run which was not performed.

154.     For the April 2014 billing cycle, Illinois Student billed CPS for special needs transportation services not provided, including, but not limited to, up to 4 runs it purported to complete on April 22, 2014. (**Ex. L**).

**H.     Illinois Central's Fraudulent Conduct**

155.     Relator repeats and realleges each and every allegation contained as if fully set forth herein.

**i.     Fraudulent Conduct Before and During the 2013 RFP**

156.     During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

157.     For the 2013 RFP, Illinois Central, a known member of the Contractors' Association, bid $256 for a first route. This bid was far above the fair market price and was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

158.     Without invitation from the Board, Illinois Central negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

159.     Every monthly invoice submitted at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

**ii.     Representative Examples of Billing for Services Not Provided and Efforts to Conceal Fraudulent Activity.**

160.     From February 16, 2013 to February 23, 2013, Jeffrey Hubert and his staff conducted a fleet audit that included an audit of 235 Illinois Central buses.  Illinois Central had

been awarded a contract that called for 201 buses. They had been billing for 222 buses. Each of these buses billed for but not awarded constituted a ghost bus.

161. On December 11, 2013, Jeff Hubert had a meeting in his office with Illinois Central Chief Operating Officer Kevin Mest, Regional Manager David Petersen, Operations Manager Kyra Terry, and CPS Quality Assurance Manager Liz Perkins. In that meeting, Kevin Mest stated that Illinois Central expected that the Board would assess liquidated damages for non-performance of the Scope of Services, and that they had built $350,000.00 into their pricing to account for the anticipated assessment of liquidated damages for non-performance. Every monthly invoice submitted to accommodate this deliberate overcharging for services not provided at the artificially inflated price was fraudulent.

162. Immediately after the meeting, Hubert told Osland of Kevin Mest's statement that Illinois Central had deliberately overcharged the Board. Osland confirmed that he was aware of the deliberate overcharge, stating that it comported with a number Illinois Central's Chief Executive Officer Steve Hemmerlein had previously provided to Osland.

163. In October 14, 2014 email correspondence, Board employee and GPS Super User William Harris detailed intentional misidentification of route information which rendered Illinois Central buses GPS invisible, making it impossible for the Board to verify whether routes were actually run. Harris identified 25 specific instances of Illinois Central's routes as improperly entered, and characterized these incorrect inputs as "liquidatable," meaning, intentional. Illinois Central's practice of mis-entering information into the GPS system to render its buses invisible was widespread, as William Harris had identified Illinois Central as one of the "same culprits," who had been consistently participating in this deceptive practice.

164.    Board employee Will Harris has confirmed under oath that these failures would render buses untrackable for purposes of determining whether a bus actually ran the intended route, unless the bus was physically followed in person.  This scheme permitted Illinois Central to hide its buses, utilize internal route structuring, and bill the Board for services not performed.

165.    Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

166.    On April 22, 2014, Defendant Illinois Central was to transport students to Camelot of Oak Park on bus "IC1270," run 0291.057. Illinois Central bus IC1270 did not complete this run. (*See* **Ex. L** at line 1572). Nonetheless, Illinois Central billed the Board for this run which was not performed.

167.    For the April 2014 billing cycle, Illinois Central billed CPS for special needs transportation services not provided, including, but not limited to, up to 23 runs it purported to complete on April 22, 2014. (**Ex. L**).

**I.      Jack Harris' Fraudulent Conduct**

168.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

**i.      Representative Examples of Billing for Services Not Provided**

169.    From February 16, 2013 to February 23, 2013, Jeffrey Hubert conducted a fleet audit that included an audit of 15 Jack Harris buses. Jack Harris had been awarded a contract that

called for 10 buses.  They had been billing for 13 buses.  Each of these buses billed for but not awarded constituted a ghost bus.

170.    In October 14, 2014 email correspondence, Board employee and GPS Super User William Harris detailed intentional misidentification of route information which rendered Jack Harris buses GPS invisible, making it impossible for the Board to verify whether routes were actually run.  Harris identified 8 specific instances of Jack Harris's routes as improperly entered, and characterized these incorrect inputs as "liquidatable," meaning, intentional.  Jack Harris's practice of mis-entering information into the GPS system to render its buses invisible was widespread, as William Harris had identified Jack Harris as one of the "same culprits," who had been consistently participating in this deceptive practice.

171.    Board employee Will Harris has confirmed under oath that these failures would render buses untrackable for purposes of determining whether a bus actually ran the intended route, unless the bus was physically followed in person.  This scheme permitted Jack Harris to hide its buses, utilize internal route structuring, and bill the Board for services not performed. Harris further confirmed under oath that this hindered his and Student Transportation Services' ability to maximize efficiency in routing.

172.    Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

173.    On April 22, 2014, Defendant Jack Harris was to transport students to CICS Ralph Ellison High School on bus "JH5," run 4911.052. Jack Harris bus JH5 did not complete this run.

43

(*See* **Ex. L** at line 2129). Nonetheless, Jack Harris billed the Board for this run which was not performed.

174.    For the April 2014 billing cycle, Jack Harris billed CPS for special needs transportation services not provided, including, but not limited to, up to 4 runs it purported to complete on April 22, 2014 (**Ex. L**).

**J.      J.L. Harris' Fraudulent Conduct**

175.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

176.    From February 16, 2013 to February 23, 2013, Jeffrey Hubert conducted a fleet audit that included an audit of 8 J.L. Harris buses.  J.L Harris had been awarded a contract that called for 11 buses.  They had been billing for 19 buses.  Each of these buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

**K.      Latino Express' Fraudulent Conduct**

177.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

**i.      Fraudulent Conduct Before and During the 2013 RFP**

178.    During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

179.    For the 2013 RFP, Latino Express, a known member of the Contractors' Association, bid $288 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. Latino Express' bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

180.    Without invitation from the Board, Latino Express negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

181.    Every monthly invoice submitted at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

### ii.    Representative Examples of Billing for Services Not Provided

182.    From February 16, 2013 to February 23, 2013, Jeffrey Hubert and his staff conducted a fleet audit that included an audit of 78 Latino Express buses.  Latino Express had been awarded a contract that called for 93 buses.  They had been billing for 112 buses.  Each of these buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

183.    Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

184.    On April 22, 2014, Defendant Latino Express was to transport students to Jose De Diego Community Academy on bus "L37," run 7420.051. Latino Express bus L37 did not complete this run. (*See* **Ex. L** at line 2757). Nonetheless, Latino Express billed the Board for this run which was not performed.

185.    For the April 2014 billing cycle, Latino Express billed CPS for special needs transportation services not provided, including, but not limited to, up to 14 runs it purported to complete on April 22, 2014. (**Ex. L**).

**L.     Ransom's Fraudulent Conduct**

186.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

**i.     Fraudulent Conduct Before and During the 2013 RFP**

187.    During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

188.    For the 2013 RFP, Ransom, a known member of the Contractors' Association, bid $285 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. Ransom's bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

189.    Every monthly invoice submitted at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

**ii.     Representative Example of Billing for Services Not Provided**

190.    Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below.

191.    On April 22, 2014, Defendant Ransom was to transport students to Mckay Elementary School on bus "RA38," run 4760.151. Ransom bus RA38 did not complete this run. (*See* **Ex. L** at line 6374). Nonetheless, Ransom billed the Board for this run which was not performed.

192.    For the April 2014 billing cycle, Ransom billed CPS for special needs transportation services not provided, including, but not limited to, up to one run it purported to complete on April 22, 2014. (**Ex. L**).

M.    **R&D Bus' Fraudulent Conduct**

193.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

### i.    Fraudulent Conduct Before and During the 2013 RFP

194.    During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

195.    For the 2013 RFP, R&D Bus, a known member of the Contractors' Association, bid $291 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. R&D Bus' bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

196.    Without invitation from the Board, R&D Bus negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

197.    Every monthly invoice submitted at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

### ii.    Representative Examples of Billing for Services Not Provided

198.    From February 16, 2013 to February 23, 2013, Jeffrey Hubert conducted a fleet audit that included an audit of 104 R&D buses.  R&D had been awarded a contract that called for

89 buses. They had been billing for 95 buses. Each of these buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

199. Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

200. On April 22, 2014, R&D Bus was to transport students from Camelot of Oak Park on bus "RD576," run 0291.152. R&D Bus RD576 did not complete this run. (*See* **Ex. L** at line 1578). Nonetheless, R&D Bus fraudulently billed the Board for this April 2014 ghost bus.

201. For the April 2014 billing cycle, R&D Bus billed CPS for special needs transportation services not provided, including, but not limited to, up to 9 runs it purported to complete on April 22, 2014. (**Ex. L**).

**N.      United Quick's Fraudulent Conduct**

202. Relator repeats and realleges each and every allegation contained as if fully set forth herein.

**i.      Fraudulent Conduct Before and During the 2013 RFP**

203. During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

204. For the 2013 RFP, United Quick, a known member of the Contractors' Association, bid $256 for a first route. This bid was far above the fair market price and was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

205.     Without invitation from the Board, United Quick negotiated a 22-mile minimum –
meaning the mileage component of its contract would be 22 miles, even if the route itself was less
than 22 miles – payment into its contract with the Board.

206.     Every monthly invoice submitted at this artificially high price was fraudulent, as it
was the result of collusion and other anticompetitive activity.

### ii.     Representative Examples of Billing for Services Not Provided

207.     From February 16, 2013 to February 23, 2013, Jeffrey Hubert and his staff
conducted a fleet audit that included an audit of 74 United Quick buses.  United Quick had been
awarded a contract that called for 53 buses.  They had been billing for 61 buses.  Each of these
buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

208.     Daily reports were generated by the Board detailing Vendors' respective run and
route information that included miles driven with students on a bus. Relator does not have access
to all of the daily reports without a reasonable opportunity for further discovery. However, one
such example of the daily report was generated on April 22, 2014 and pertinent portions are
attached hereto as described below. (**Ex. L**).

209.     On April 22, 2014, Defendant United Quick was to transport students to Belding
Elementary School on bus "U27," run 2260.001. United Quick bus U27 did not complete this run.
(*See* **Ex. L** at line 657). Nonetheless, United Quick billed the Board for this run which was not
performed.

210.     For the April 2014 billing cycle, United Quick billed CPS for special needs
transportation services not provided, including, but not limited to, up to 23 runs it purported to
complete on April 22, 2014. (**Ex. L**).

### O. Walls' Fraudulent Conduct

211.     Relator repeats and realleges each and every allegation contained as if fully set forth herein.

212.     Walls was a known member of the Contractors' Association.

213.     During the 2013 RFP, Walls included an identical 22-mile minimum mileage component in its opening bid.

214.     Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

215.     On April 22, 2014, Defendant Walls was to transport students to Pirie Elementary Fine Arts & Academic Center on bus "WH21," run 5440.151. Walls bus WH21 did not complete this run. (*See* **Ex. L** at line 7824). Nonetheless, Walls billed the Board for this run which was not performed.

216.     For the April 2014 billing cycle, Walls billed CPS for special needs transportation services not provided, including, but not limited to, up to 2 runs it purported to complete on April 22, 2014. (**Ex. L**).

**P.      Sunrise's Fraudulent Conduct**

217.      Relator repeats and realleges each and every allegation contained as if fully set forth herein.

**i.      Fraudulent Conduct Before and During the 2013 RFP**

218.      During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

219.      For the 2013 RFP, Sunrise, a known member of the Contractors' Association, bid $291 for a first route. This bid was far above the fair market price and within a $17 range established by bids from other members of the Contractors' Association. Sunrise's bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

220.      Without invitation from the Board, Sunrise negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

221.      Every monthly invoice submitted at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

**ii.      Representative Examples of Billing for Services Not Provided**

222.      From February 16, 2013 to February 23, 2013, Jeffrey Hubert and his staff conducted a fleet audit that included an audit of 237 Sunrise buses.  Sunrise had been awarded a contract that called for 233 buses.  They had been billing for 283 buses.  Each of these buses billed for but not awarded constituted a ghost bus, and thus was fraudulent.

223.      Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access

to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

224.    On April 22, 2014, Defendant Sunrise was to transport students to Blair Early Childhood Center on bus "S5405," run 4990.055. Sunrise bus S5405 never completed this run. (*See* **Ex. L** at line 966). Nonetheless, Sunrise billed the Board for this run which was not performed.

225.    For the April 2014 billing cycle, Sunrise billed CPS for special needs transportation services not provided, including, but not limited to, up to 63 runs it purported to complete on April 22, 2014. (**Ex. L**).

226.    In July 2014, Jeff Hubert instructed Board employee Liz Perkins to conduct a physical audit (Perkins observing students entering and exiting buses) of Vendors providing summer school busing services.

227.    From July 21 to July 23, 2014, Liz Perkins' physical audit of Sunrise revealed that Sunrise was picking up significantly less summer school riders than planned. (**Ex. K**). For instance:

   a.   On July 23, 2014, Sunrise run 2480.052 called for transport of 7 riders to Burnham Math & Science Academy. The bus assigned to that route transported 1 riders.

   b.   On July 23, 2014, Sunrise run 2480.056 called for transport of 8 riders to Burnham Math & Science Academy. The bus assigned to that route transported 3 riders.

   c.   On July 23, 2014, Sunrise run 1790.052 called for transport of 10 riders to Chicago High School for Agricultural Sciences. The bus assigned to that route transported 2 riders.

228.    Sunrise used inflated ridership numbers like these to justify unnecessary additional buses, which it then billed to the Board monthly.

**Q.      First Student's Fraudulent Conduct**

229.    Relator repeats and realleges each and every allegation contained as if fully set forth herein.

### i.      Fraudulent Conduct Before and During the 2013 RFP

230.    During the 2013 RFP, consultants from AT Kearney, including Patrick Hoffmann and Korhan Acar, determined that the "should-be" – fair market price – for a first route was $212.

231.    For the 2013 RFP, First Student bid $285 for a first route. This bid was far above the fair market price and within a $17 range established by bids from members of the Contractors' Association. First Student's bid was part of the Contractors' Association agreement to fix prices for bus services at anti-competitively high levels. (*See* ¶ 52).

232.    Further, and without invitation from the Board, despite its status as a new entrant to the Chicago market, First Student negotiated a 22-mile minimum – meaning the mileage component of its contract would be 22 miles, even if the route itself was less than 22 miles – payment into its contract with the Board.

233.    Every monthly invoice submitted at this artificially high price was fraudulent, as it was the result of collusion and other anticompetitive activity.

### ii.      Representative Examples of Billing for Services Not Provided

234.    Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below. (**Ex. L**).

235. On April 22, 2014, Defendant First Student was to transport students to Brunson Elementary School on bus "FS080019," run 2550.051. First Student bus FS080019 never completed this run. (*See* **Ex. L** at line 1379). Nonetheless, First Student billed the Board for this run which was not performed.

236. For the April 2014 billing cycle, First Student billed CPS for special needs transportation services not provided, including, but not limited to, up to 8 runs it purported to complete on April 22, 2014. (**Ex. L**).

**R.    Chicago School Transit's Fraudulent Conduct**

237. Relator repeats and realleges each and every allegation contained as if fully set forth herein.

238. In October 14, 2014 email correspondence, GPS Super User William Harris detailed intentional misidentification of route information which rendered Chicago School Transit buses GPS invisible, making it impossible for the Board to verify whether routes were actually run.  Harris identified 13 specific instances of Chicago School Transit's routes as improperly entered, and characterized these incorrect inputs as "liquidatable," meaning, intentional.  Chicago School Transit's practice of mis-entering information into the GPS system to render its buses invisible was widespread, as William Harris had identified Chicago School Transit as one of the "same culprits," who had been consistently participating in this deceptive practice. (**Ex. D**).

239. Will Harris confirmed under oath that these failures would render buses untrackable for purposes of determining whether a bus actually ran the intended route, unless the bus was physically followed in person.  This scheme permitted Chicago School Transit to hide its buses, utilize internal route structuring, and bill the Board for services not performed.  Harris further

confirmed under oath that this hindered his and Student Transportation Services' ability to maximize efficiency in routing.

240.　Daily reports were generated by the Board detailing Vendors' respective run and route information that included miles driven with students on a bus. Relator does not have access to all of the daily reports without a reasonable opportunity for further discovery. However, one such example of the daily report was generated on April 22, 2014 and pertinent portions are attached hereto as described below.

241.　On April 22, 2014, Defendant Chicago School Transit was to transport students to Bowen High school on run "CH464," run 7540.052.  Chicago School Transit bus CH464 never completed this run. (*See* **Ex. L** at line 1160). Nonetheless, Chicago School Transit billed the Board for this run which was not performed.

242.　For the April 2014 billing cycle, Chicago School Transit billed CPS for special needs transportation services not provided, including, but not limited to, up to 10 runs it purported to complete on April 22, 2014. (**Ex. L**).

## COUNT I
### (Federal False Claims Act – Presentation of False Claims)
### (31 U.S.C. §3729(a)(1))

243.　Relator repeats and realleges each and every allegation contained as if fully set forth herein.

244.　Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

245.　By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT II**
**(Federal False Claims Act – Making or Using a False Record or Statement)**
**(31 U.S.C. § 3729(a)(2))**

246.     Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

247.     Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

248.     By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT III**
**(Federal False Claims Act – Conspires to Defraud)**
**(31 U.S.C. §3729(a)(3))**

249.      Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

250.     Defendants knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid by the United States.

251.     By virtue of the false and fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT IV**
**(Illinois False Claims Act – Presentation of False Claims)**
**(740 ILCS §175/3(a)(2))**

252.     Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

253.     Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the State of Illinois.

254.     By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and therefore is entitled to multiple damages under the Illinois False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT V**
**(Illinois False Claims Act – Making or Using a False Record or Statement)**
**(740 ILCS §175/3(a)(2))**

255.     Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

256.     Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Illinois.

257.     By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and therefor is entitled to multiple damages under the Illinois False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT VI**
**(Illinois False Claims Act – Conspires to Defraud)**

258.     Relator repeats and realleges each and every allegation contained above as if fully set forth herein.

259.     Defendants knowingly conspired to defraud the State of Illinois by getting false or fraudulent claims allowed or paid by the State of Illinois.

260.     By virtue of the false and fraudulent claims made by Defendants, the State of Illinois suffered damages and is entitled to multiple damages under the Illinois False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

WHEREFORE, Relator prays that the Court enter judgment against Defendants, and in favor of the Governments and Relator as follows:

A.    Order Defendants to cease and desist from violating the False Claims Acts as stated herein;

B.    Award the Governments the maximum amount of damages they sustained as a result of Defendants' actions, as well as the maximum amount of civil penalties, as permitted, for each of the Governments' False Claims Acts.

C.    Award Relator, Jeffrey Hubert, the maximum reward allowed pursuant to the *qui tam* provisions of the Governments' False Claims Act.

D.    Award Relator, Jeffrey Hubert, all costs and expenses of this action, including Attorney's fees; and

E.    Awarding the Governments and Relator, Jeffrey Hubert, all such relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands trial by jury.

By:

Dated: January 16, 2018

*/s/ Patrick J. Giese*
Attorney for Relator

Shawn S. Kasserman
Patrick J. Giese
Patrick M. Grim
TOMASIK KOTIN KASSERMAN, LLC
Attorneys for Relator
161 North Clark Street, Suite 3050
Chicago, Illinois 60601
(312) 605-8800
shawn@tkklaw.com
pat@tkklaw.com

## <u>CERTIFICATE OF SERVICE</u>

   I certify that I caused the foregoing document to be sent to all attorneys of record via the Court's electronic notification system on January 16, 2018.


             */s/ Patrick J. Giese*
             Patrick J. Giese