IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THE UNITED STATES OF AMERICA
*ex rel.* JEFFREY HUBERT; THE
STATE OF ILLINOIS *ex rel.*
JEFFREY HUBERT,

               Plaintiffs,

          v.

THE BOARD OF EDUCATION OF
THE CITY OF CHICAGO, a
Municipal Corporation, *et
al.*,

               Defendants.

Case No. 16 C 4336

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Defendants Chicago School Transit, Inc., Illinois Student Transportation, Inc., Caravan School Bus Company, Illinois Central School Bus, Inc., First Student, Inc., Falcon Transportation, Inc., Alltown Bus Service, Inc., Latino Express, Inc., United Quick Transportation, Inc., A.M. Bus Company, and the Board of Education of the City of Chicago (collectively "Defendants") each file a Motion to Dismiss Plaintiff-Relator Jeffrey Hubert's Third Amended Complaint ("Complaint"). (Dkt. No. 99.)  For the reasons stated herein, Defendants' Motions (Dkt. Nos. 113, 115, 116, 117, 119, 121, 123, 124, 126, 132) are granted, and Plaintiff's Complaint is dismissed with prejudice.

# I.  <u>BACKGROUND</u>

This case arises from an alleged Medicaid reimbursement scheme to defraud the State of Illinois and the United States (collectively the "Government").  The specific details of the scheme will be discussed at relevant points throughout this opinion, but for now the Court provides a brief overview.

From January 2013 to February 2015, Plaintiff-Relator Jeffrey Hubert served as the Director for Student Transportation Services ("STS"), an arm of the Chicago Public Schools system ("CPS"). (Third Amend. Compl. ("Compl.") ¶ 6, Dkt. No. 99.)  During that time, Hubert allegedly uncovered evidence of widespread fraudulent practices by numerous yellow bus companies (the "Vendors") with which the Board of Education of the City of Chicago (the "Board") contracts to provide services to special needs students within CPS. (Compl. ¶ 1.)  Apparently, the Vendors colluded on contract prices for their services during the competitive bidding process. Based on those prices, the Vendors then submitted false invoices to the Board which included charges for so-called "ghost buses"—bus services never actually rendered—and for "ghost riders"—students who never actually rode the bus. (Compl. ¶¶ 1, 36-38, 77, 79, 92.)  The Vendors employed several tactics to ensure their scheme went undetected; most notably, concealing newly developed bus routes that deviated from the Board's predetermined ones and

tampering with the Board's GPS tracking system used to corroborate invoices with services provided. (Compl. ¶¶ 57, 60, 63, 66-69.) And yet, the Board nevertheless knew the invoices were false and relied on them anyway to support their reimbursement claims to the Government. (Compl. ¶ 77.) In other words, and in sum, the Board enabled a handful of vendors to overcharge for their school bus services by submitting false claims to Medicaid for partial reimbursement. These findings led Hubert to bring this *qui tam* action.

On the Government's behalf, Hubert seeks to recover damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the Illinois False Claims Act ("IFCA"), 740 ILCS 175/1 *et seq.*, for Defendants' alleged fraudulent reimbursement scheme. (Compl. ¶ 2.) Hubert presents three theories in asserting Defendants violated the FCA: (1) Defendants participated in a bid-rigging scheme; (2) the Vendors submitted false or misleading invoices to the Board, which the Board then used to submit false claims to the Government; and (3) Defendants illegally induced the Government to reimburse false claims. (*See generally* Compl.) All three will be discussed when necessary throughout this opinion.

The Board and ten of the Vendors—Chicago School Transit, Inc., Illinois Student Transportation, Inc., Caravan School Bus Company,

Illinois Central School Bus, Inc., First Student, Inc., Falcon Transportation, Inc., Alltown Bus Service, Inc., Latino Express, Inc., United Quick Transportation, Inc., and A.M. Bus Company—move individually to dismiss Hubert's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defendants argue that Hubert's Complaint fails to satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b) both generally and individually as against the Board and each of the Vendors. Because the separate Motions overlap and pertain to the same issues, the Court will consider them all together.

## II. <u>ANALYSIS</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, if accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)). We "must accept as true all of the allegations contained in the complaint" that are not legal conclusions. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Claims of fraud, however, must be pled under a heightened pleading standard, which requires stating with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017). This

"ordinarily requires describing the who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736-37 (7th Cir. 2014). In other words, the complaint must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) (internal quotation marks and citation omitted).

Rule 9(b) has three main purposes: (1) to protect defendants' reputation from harm; (2) to minimize "strike suits" and "fishing expeditions"; and (3) to provide adequate notice of the claim to defendants. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 776 (7th Cir. 1994) (citation omitted); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) ("As one district court has noted, the particularity requirement of Rule 9(b) is designed to discourage a 'sue first, ask questions later' philosophy."). Moreover, complying with Rule 9(b) is especially important in FCA cases involving multiple defendants. "Where there are allegations of a fraudulent scheme with more than one defendant, the complaint should inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular

defendant." *Balabanos v. N. Am. Inv. Group, Ltd.*, 708 F. Supp. 1488, 1493 (N.D. Ill. 1988) (citations omitted).

## A.    The False Claims Act

The FCA imposes civil liability for a series of actions under 31 U.S.C. § 3729(a)(1).  Hubert brings three separate claims under the FCA: § 3729(a)(1)(A), (B), and (C).  Section 3729(a)(1)(A) prohibits "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" by the Government.  31 U.S.C. § 3729(a)(1)(A).  Section 3729(a)(1)(B) prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim" to the Government. 31 U.S.C. § 3729(a)(1)(B).  To plead adequately a violation of either, Hubert must allege that (1) Defendants made a statement in order to receive money from the Government; (2) the statement was false; and (3) Defendants knew the statement was false. *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011); *see also Grenadyor*, 772 F.3d at 1105 (Defendants "must know the claim is false." (citing *U.S. ex rel. Gross v. AIDS Res. Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005))).  Finally, section 3729(a)(1)(C)

prohibits conspiring with others to commit either of the above violations. 31 U.S.C. § 3729(a)(1)(C).

Stated broadly, Defendants—the Board and the Vendors—argue that the allegations in Hubert's Complaint are not sufficiently particular under Rule 9(b) and fail to state claims for which relief may be granted under Rule 12(b)(6).

### 1. *Rule 9(b): the Who, What, Where, When, and How*

As a preliminary matter, the Court notes that Hubert brings this action based on personal knowledge—"as to himself and his own acts." (Compl. ¶ 6.) Absent from his current (third) Complaint but provided for in his Second Amended Complaint was language that anything else asserted outside of his personal knowledge was asserted "upon information and belief." (Pl.'s Second. Am. Compl. ¶ 5, Dkt. No. 53.) Whether this remains true is unclear since Hubert reasserts the same allegations—this time, in more detail— but omits any indication of how he derived such allegations other than from his personal knowledge. Generally, allegations based on information and belief are insufficient to meet Rule 9(b)'s particularity requirement. *Pirelli*, 631 F.3d at 443 (citation omitted). But an exception applies if Hubert can show that (1) the facts constituting fraud are not accessible to him, and (2) he provides grounds for his suspicion. *Grenadyor*, 772 F.3d at 1108.

As to the first prong, Hubert argues that Defendants are in control of the documents needed to support his claims. These documents include:

> monthly vendor-specific GPS reports; monthly driver payroll records of each vendor, Illinois Department of Transportation Safety Lane inspection reports for every vendor Defendant bus; monthly Edulog run and route details allegedly run by each vendor Defendant; dozens of reversed and manipulated run map illustrations in Edulog; and the Board's bus routing and planning software

(Pl.'s Resp. to Defs.' Mot. to Dismiss 8-9, Dkt. No. 141.) Hubert relies on *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998), which found "that the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail [his] claim." In sum, Hubert argues that he cannot sufficiently allege the particulars of the alleged fraud without conducting discovery first.

The Court disagrees. First, Hubert was not some low-level employee or outside competitor. For over two years, he served as Director of Transportation Operations for STS, a high enough position for Hubert to access some, if not all, of the relevant information needed to show with sufficient particularity that there indeed existed a scheme to defraud the Government. (Compl. ¶ 6.) Second, there is nothing to suggest that during that time, Hubert was unable to obtain any of the documents recited above.

Therefore, he is required to plead his FCA claims "at an individualized transaction level." *U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 742 (7th Cir. 2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009); *see also Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 826-27 (N.D. Ill. 2016) (finding that the plaintiff must plead his claims with particularity at an individualized transaction level because the plaintiff served as the defendant's COO during the relevant time period and was in a position to obtain the relevant records for his FCA claims). Accordingly, Hubert's argument fails. If he cannot allege sufficient and particular facts giving rise to his FCA claims, even after having maintained his Director position with STS, then he pleads himself out of Court.

To meet the particularity requirement, Hubert must plead "who agreed with whom, how they agreed, how they decided to file a false claim, who made the alleged misrepresentation, who filed the allegedly false claim, the method by which it was filed, and how much the payment was for." *U.S. ex rel. Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 898 (N.D. Ill. 2009). As earlier described, Hubert must plead the Who, What, When, Where, and How. *Camasta*, 761 F.3d at 736-37.

The Court turns first to the Who. Hubert fails to mention either an individual within one of the Vendors that submitted the

alleged fraudulent invoices or an individual within the Board that ultimately submitted the alleged fraudulent claims to Medicaid. The Complaint refers generally to the Vendors and vaguely to "agents and/or employees of the Board" but fails to specify whom. (Compl. ¶ 37.) In doing so, the Complaint broadly implicates the entirety of the Board and the Vendors in the scheme, which is insufficient under Rule 9(b). *See, e.g.*, *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 950 (7th Cir. 2013) (affirming dismissal because the plaintiff failed to identify who specifically made the fraudulent representation and that the plaintiff's "and/or formulations obscure identifications of the relevant parties"); *see also U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharm., Inc.*, 895 F. Supp. 2d 872, 879 (N.D. Ill. 2012) (holding that the "ultra-vague 'PharmaLife'"—a series of pharmacies owned and controlled by the defendants—did not satisfy the Who requirement), *aff'd in part and rev'd in part on other grounds*, 772 F.3d 1102 (7th Cir. 2014).

As for the What, Hubert fails to discuss the actual reimbursement requests from the Board to Medicaid. *Grenadyor*, 772 F.3d at 1107. Instead, he focuses on the Vendors' alleged misrepresentations in the invoices they submitted to the Board and on an alleged bid-rigging scheme. The Complaint thus fails to show with particularity the falsity of the requests for reimbursement themselves, which serves as the *sine qua non* of an FCA claim. *Mason*

*v. Medline Indus., Inc.*, No. 07 C 5615, 2009 WL 1438096, at *4
(N.D. Ill. May 22, 2009). The Complaint is silent as to: what
services were provided by which Vendors; what certifications the
Board made in response to the Vendors' requests; what amount the
Board received from Medicaid; what amount the Board paid to the
Vendors upon receipt of the Medicaid funds; and so forth. Hubert
cannot "merely . . . describe a private scheme in detail but then
. . . allege simply and without any stated reason for his belief
that claims requesting illegal payments must have been submitted,
were likely submitted or should have been submitted to the
Government." *U.S. ex rel. Quinn. v. Omnicare Inc.*, 382 F.3d 432,
440 (3rd Cir. 2004) (internal quotation marks and citation
omitted); *see also Fowler*, 496 F.3d at 741-42 (finding that the
plaintiffs did "not present any evidence at an individualized
transaction level to demonstrate" fraudulent retention of federal
refunds); *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d
374, 378 (7th Cir. 2003) ("Some [allegations] come close[ ] to
specific allegations of deceit but [the plaintiffs] fail to link
them to any claim for payment.").

The Where, When, and How are also unclear. Is Hubert referring
to the claims submitted to Medicaid during his two-year stint as
Director? If not, what is the period of time for which the alleged
false claims were submitted to the Government? How often, when,

and where were they submitted? *See Walner*, 660 F. Supp. 2d at 897-98 (affirming dismissal of FCA claims for defects in the complaint, including plaintiff's failure to identify "where and when the allegedly false claim was made"). At the outset, Hubert's Complaint raises more questions than it answers. He fails to plead with particularity as required by Rule 9(b). The Court will discuss that failing in greater detail below.

### 2. Counts I and II: FCA Fraud Claims

Generally, Defendants contend that dismissal is warranted under 12(b)(6) because Hubert fails to plead adequately (1) that Defendants acted "knowingly"; (2) that the reimbursement claims were false; and (3) that the false claims were material to the Government's reimbursement. While Defendants also raise several other objections, the Court finds each of these three dispositive and need not venture further in reaching its decision. *See Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (suggesting that "concerns about fair notice and open-ended liability [in FCA cases] can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements" (internal quotation marks and citation omitted)).

Finally, the Court notes that Defendants' objections often rest upon purported inconsistencies between the Complaint and the exhibits attached to it. Not all of the inconsistencies that

Defendants point out are material. But where they are, the Court recognizes the appropriate standard: "Where an exhibit and the complaint conflict, the exhibit typically controls." *Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2005) (citation omitted). Moreover, "[a] court is not bound by the party's characterization of an exhibit and may independently examine and form its own opinions about the document." *Id.* (citation omitted).

### *a. Knowledge*

To prevail on his FCA claim, Hubert must show that the Board and the Vendors each acted "knowingly" as to the falsity of the statement in dispute. *Yannacopoulos*, 652 F.3d at 822. A person acts "knowingly" if he or she "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

In his Complaint, Hubert alleges that the Board "knowingly acquiesced to artificially inflated prices by awarding contracts based on prices it knew to be anti-competitively high and based on collusion, then submitted reimbursement claims to the Government using pricing it knew to be false and anti-competitively high." (Compl. ¶ 77.) As for the Vendors, Hubert generally alleges that

they "have been knowingly submitting false claims for payment for services not rendered[.]" (Compl. ¶ 37.) The Board and the Vendors will be discussed separately.

i.  The Board

Hubert supports his claim that the Board acted "knowingly" by detailing a conversation he had with two representatives of the Vendor Sunrise Transportation Inc. In that conversation, the representatives allegedly informed Hubert that the Board "tried to pit" the Vendors against each other "and the Vendors were not going to let that happen." (Compl. ¶ 50.) Instead, the Vendors decided to meet with each other to agree upon pricing for service contracts. (Compl. ¶ 50.) Upon discovering that the Vendors were colluding on price for their services, Hubert reported the conversation to Transportation Department Executive Director Paul Osland ("Osland"). (Compl. ¶ 50.) In response, however, Osland opted not to investigate the matter. (Compl. ¶ 80.) Rather, Osland told Hubert that "if we disqualified every vendor that stole from CPS over the last five years, we wouldn't have any vendors left." (*Id.*) Based on the conversations with Osland and Sunrise's representatives, Hubert claims the Board knew that the invoices were false and relied on them anyway to submit reimbursement requests to the Government.

The Board does not deny the foregoing facts, but nevertheless contends that the requisite scienter requirement has not been met. It argues that Hubert asserts inconsistent factual allegations about the Board's knowledge which warrant dismissal. First, Hubert alleges that the Vendors concealed certain information from the Board; for example, the Vendors' internal bus routes from the Board's GPS tracking systems. (Compl. ¶ 57, 60, 63, 66, 69.) Second, Hubert alleges that the Vendors developed and maintained internal bus routes different from the Board's pre-determined routes, and they did so "without notifying the Board." (Compl. ¶¶ 66-68.) Finally, the Complaint provides that the Vendors could use editing software "to manipulate the Board's own internal route information." (Compl. ¶ 69.) The Board argues that these allegations demonstrate that it could not have acted knowingly since it would have been unaware if and when the Vendors were submitting fraudulent invoices based on inflated ridership and route information.

Moreover, the Board contends that the exhibits attached to the Complaint bolster their argument. The Board asserts that whenever it discovered ridership or route discrepancies, it immediately rectified them, and Hubert has failed to identify one instance where rectification did not occur upon discovering such discrepancies. In his response, Hubert makes no attempt to

reconcile any of the alleged inconsistencies, let alone provide support other than reasserting what has already been stated in his Complaint.

The Court notes that the aforementioned inconsistencies do, in fact, exist in the Complaint. With that said, perhaps it is still plausible that the Board knew that the Vendors colluded on price; however, that is beside the point. Hubert must show that the Board knew that the specific invoices, submitted by the Vendors and relied on by the Board for reimbursement, were false. Because Hubert presents inconsistent facts as to this specific point, he has failed to adequately plead that the Board acted "knowingly." *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (reiterating that "our pleading rules do not tolerate factual inconsistencies in a complaint").

Hubert's allegations are equally insufficient to show that the Board acted with deliberate ignorance or reckless disregard for the truth. To establish either, Hubert must show that the Board acted with aggravated gross negligence. *U.S. v. King-Vassel*, 728 F.3d 707, 712-13 (7th Cir. 2013). Despite Hubert's conversation with Osland, the Board's ongoing efforts to detect fraud and rectify inaccuracies belie any deliberate ignorance or reckless disregard. For example, as mentioned earlier, the Board implemented GPS tracking of the Vendors' buses. According to the

Complaint: "Functioning GPS trackers would make all of [the Vendors'] vehicles trackable and the mileage ultimately billed to the Board verifiable. This would impede the Vendors' efforts to overbill the Board." (Compl. ¶ 62.) The fact that Hubert informed Osland that the Vendors were acting in a way that would take advantage of the Board does not undercut such efforts. Throughout the Complaint, Hubert repeatedly refers to such efforts, which include the Board managing, controlling, and minimizing efficiencies, such as imposing liquidated damages, upgrading tracking systems, improving internal processes, and conducting on-site audits. (*See* Compl. ¶¶ 62-63, 67-68, 74, 86; Exs. C, D, E, G, I to Compl.) As such, Hubert fails to show that the Board acted with deliberate ignorance or reckless disregard for the truth.

### ii.   The Vendors

In addition to the conversation Hubert had with Osland and Sunrise's representatives, Hubert alleges that the individual Vendor bids in the 2013 Request for Proposal ("RFP")—the process for awarding contracts to the Vendors for bus services—were "remarkable." (Compl. ¶ 45.) Apparently, eleven Vendors, all members of the Contractors' Association ("CA")—Alltown, A.M. Bus, Ammons, Caravan, Falcon, First Student, Illinois Central, Illinois Student, Latino Express, R.D. Bus, Sunrise, and United Quick— "included an identical 22-mile minimum mileage component in each

of their opening bids," which was "not called for." (Compl. ¶ 51.)

Ten of these members, plus Ransom—another CA member—also submitted

bids for first route rates within $17 of one another, all of which

were above the alleged fair market price of $212:

- Alltown:              $294
- A.M. Bus:             $289
- Ammons:               $277
- Caravan:              $289
- Falcon:               $289
- Illinois Student:     $288
- Latino Express:       $288
- Ransom:               $285
- R.D. Bus:             $291
- Sunrise:              $291
- First Student:        $285

(Compl. ¶ 52.) Hubert argues that this information is sufficient

to demonstrate that the Vendors colluded on price and knowingly

submitted false claims to the Board based on that pricing. He

further supports his allegations with several examples of alleged

bus services that never took place and alleged inaccurate ridership

data contained in certain invoices. (*See generally* Compl.)

What the Complaint fails to state, however, are any specific

facts demonstrating what occurred at the individualized

transactional level for each Vendor. *See U.S. ex rel. Berkowitz

v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018). Hubert

mentions no employee, agent, or representative of a Vendor that

knew or should have known of such inaccuracies contained in any of

the invoices. And as was the case with the Board, the information he does present proves to be inconsistent. For example, Hubert provides five paragraphs about Chicago School Transit ("CST") that rely on Exhibit D and Exhibit L to assert that CST acted fraudulently. (Compl. ¶ 238-42.) Hubert alleges that in thirteen instances, CST intentionally misidentified route information, which rendered the GPS tracking invisible and it impossible for the Board to verify if the bus run had occurred. Yet, as the email thread in Exhibit D demonstrates, these same routes are, in fact, not hidden. Instead, the Board intended to penalize CST under the contract for "invalid route inputs." (Ex. D to Compl.) Hubert additionally alleges that CST billed the Board for work that it did not perform. But this allegation is contradicted by Exhibit L, which shows that the work was indeed performed (*e.g.*, Hubert alleges that CST's bus #CH464 never completed its run (Compl. ¶ 241), but Exhibit L provides that #CH464 performed route ID 1221, specifying that it arrived at Bowen High School at 7:36.55 a.m. and departed at 7:40.45 (Ex. L to Compl.)). In this instance, Hubert diminishes his allegations by referring to documents that directly contradict those allegations. *Forrest*, 507 F.3d at 542. Other Vendors similarly pointed to factual inconsistencies between the Complaint and the attached exhibits as applied against them individually. (*See e.g.*, Ill. Student Trans. Mot. to Dismiss, Dkt.

No. 115; First Student Mot. to Dismiss, Dkt. No. 119; Falcon Trans. Mot. to Dismiss, Dkt. No. 121; Alltown Bus Serv. Mot. to Dismiss, Dkt. No. 123; Latino Express & United Quick's Mot. to Dismiss, Dkt. No. 124; A.M. Bus Comp. Mot. to Dismiss, Dkt. No. 132.)

Also absent from the Complaint is whether Hubert ever informed any of the Vendors that they were submitting inaccuracies and, if so, whether the Vendors nevertheless continued to do so. At most, Hubert's allegations claim that the individual Vendors made mistakes or were negligent with the information they provided in the invoices. And even that claim has been contradicted by the exhibits provided. As such, Hubert's allegations are insufficient to infer fraud under the FCA. *Berkowitz*, 896 F.3d at 842 (citing *Fowler*, 496 F.3d at 742 (noting that "'innocent' mistakes or negligence are not actionable" under the FCA (citations omitted))); *see also Yannacopoulos*, 652 F.3d at 832 (emphasizing that the FCA "does not penalize all factually inaccurate statements, but only those statements made with knowledge of their falsity"). The FCA is not "'an all-purpose antifraud statute' . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health*, 136 S. Ct. at 2003. Moreover, "[a]ny allegation that lumps all defendants together and is bereft of any detail about who did what fraudulent activity necessarily fails to satisfy Rule 9(b)." *U.S. ex rel. Ailabouni v.*

*Adv. Health & Hosps. Corp.*, No. 13-CV-1826, 2017 WL 4310640, at *7 (N.D. Ill. Sept. 28, 2017) (internal quotation marks and citation omitted). Without more regarding the particularities of the fraud scheme, Hubert fails to plead that any individual Vendor acted "knowingly."

### b.  False Misrepresentations

Hubert's falsehood allegations fare no better. "The *sine qua non* of a[n FCA] violation is the submission of a fraudulent claim." *Mason*, 2009 WL 1438096, at *4 (citation omitted). A relator cannot merely "describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002).

Hubert alleges that the Vendors submitted false invoices to the Board for bus services that were based on fixed prices and that requested reimbursement for "ghost riders" or "ghost buses." (Compl. ¶ 4.) Despite detailing why Hubert believes the prices were fixed and providing some statistics for false or inflated ridership (which, as demonstrated above, have proven inconsistent), Hubert fails to identify or plausibly explain why any single reimbursement request from the Board to Medicaid was

false. The reimbursement request to the Government itself is the crux of the FCA claim, and yet, the falsity of those specific requests is wholly unclear here. Of the many invoices submitted to the Board, which contained false information? Of the information presented in those invoices, what did or did not constitute false information? Of that false information, what was knowingly used by the Board in its submission of claims for reimbursement? What is the relationship between the alleged price fixing of the Vendors' services, the Board's claims submitted to Medicaid, and the Board's ultimate payment to the Vendors through reimbursement from Medicaid? The answers to these questions remain unclear.

As for his bid-rigging theory, Hubert relies on: (1) the Sunrise representatives' statements; and (2) the Vendors' "opening bids" that provided contract prices allegedly well above fair market value, within $17 of each other, and which each presented an exact 22-mile minimum for bus routes. (Compl. ¶¶ 51-53.) Hubert contends that fifteen of the seventeen named Vendors were members of the Contractors' Association, which "met regularly leading up to and during the 2013 RFP to discuss and agree upon pricing." (Compl. ¶ 48.) Hubert also asserts that the other two named Vendors, not members of the Association—Chicago School Transit, Inc. and First Student, Inc.—must have partaken in the bid-rigging scheme because of the similarities presented in their bids. (Compl.

¶¶ 48, 93-242.) The foregoing observations led Hubert to believe that Defendants, all together, engaged in price fixing. His inference is a leap greater than Rule 9(b) permits.

During the 2013 RFP, the Board allegedly provided pricing "targets" to the Vendors. (Compl. ¶ 54.) Absent from the Complaint, however, are what these "targets" were and how they compared with the opening bids. That information would determine whether the Vendors in fact exceeded the "target," which, in turn, might provide additional insight as to whether a scheme to defraud the Government took place. Nevertheless, there is no showing whether the bids were above, below, or at the target range, which undercuts an inference that the bid process unfairly raised rates. *See, e.g.*, *Presser*, 836 F.3d at 779-80 (affirming dismissal of FCA claims for "fail[ing] to put the defendant's alleged activity into its relevant context," noting that "the data presented in the complaint, untethered as they are, cannot corroborate a fraud because their free-floating nature stymies any meaningful understanding of what the numbers mean" (international quotation marks and citation omitted)). Such an omission undermines the alleged falsity of the invoices given to the Board and the claims submitted by the Board to Medicaid for reimbursement. As such, the alleged falsity is too far a stretch to withstand dismissal.

*c.  Materiality*

Even if this Court had concluded Hubert plausibly alleged that the invoices at issue were false and that Defendants knew the invoices were false, the question would remain whether the invoices were *material* to the Government's decision to pay.

Under the FCA, materiality means "having a natural tendency to influence, or be capable of influencing the payment" by the Government. 31 U.S.C. § 2719(b)(4). "Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 136 S. Ct. at 2004 n.6. "Not every breach of contract or regulation is material, and 'minor or insubstantial' noncompliance never is." *U.S. ex rel. Kietzman v. Bethany Cir. of King's Daughters of Madison*, 305 F. Supp. 3d 964, 977 (S.D. Ind. 2018) (quoting *Escobar*, 136 S. Ct. at 2003). To be material, the Government must have made the payment for reimbursement "as a result of the defendant's alleged misconduct." *U.S. ex rel. Ge v. Takeda Pharm. Co. Ltd.*, 737 F.3d 116, 124 (1st Cir. 2013).

Absent from the Complaint is any mention of materiality. Notwithstanding the lack of pleading, Hubert argues in his response that the "Government[ ] would not have paid the claims to CPS had they been aware of the reimbursement scheme." (Pl.'s Resp. to Defs.' Mot. to Dismiss 13.) Moreover, he claims that "STS received

$130 million per year in block grants and Medicaid from the Government[ ] for transporting Special Need students" and he "has identified over 1,000 non-riders which were used by the Board to justify billing for more buses than were needed[.]" (*Id.*) Hubert's argument misses the mark.

First, as explained above, the Court notes that some of the numbers Hubert provides are inaccurate. Even if such numbers were accurate, it is not so clear that they would give rise to materiality. Mistakes in ridership data are inevitable, especially when the Board is accounting for dozens of bus vendors, hundreds of school buses and bus routes, and thousands of students for which bus services are provided. Second, the fact that STS received $130 million insinuates nothing other than that Defendants and the Government maintain a relationship based on Medicaid reimbursements. Without more, Hubert fails to allege materiality. *See Kietzman*, 305 F. Supp. 3d at 977 (finding that the plaintiff failed to plead materiality because "[n]o facts [were] alleged as to what types of claims the government usually did or did not pay, nor as to what the government's compliance priorities were, nor as to the degree of severity of the [defendant's] alleged breaches of regulation").

In sum, Hubert has not pled with the requisite particularity that any of the alleged violations were so material that the

Government would refuse payment were it aware of the violation. *Escobar*, 136 S. Ct. at 2004. Hubert does not meet the strict materiality showing required to state a claim under the FCA. Accordingly, Counts I and II and dismissed.

### 3. *Count III: FCA Conspiracy Claim*

Defendants further contend that Hubert fails to state a claim for conspiracy under the FCA. "The Seventh Circuit has held that general civil conspiracy principles apply to FCA conspiracy claims." *Singer*, 202 F. Supp. 3d at 827. To plead conspiracy, Hubert must allege two elements: (1) that Defendants "had an agreement, combination, or conspiracy to defraud the [G]overnment by getting a false or fraudulent claim allowed or paid;" and (2) Defendants did so "for the purpose of obtaining or aiding to obtain payment from the [G]overnment or approval of a claim against the [G]overnment." *Walner*, 660 F. Supp. 2d at 895-96 (citations omitted). "Put differently, an actionable FCA conspiracy exists only where at least one of the alleged co-conspirators actually committed an FCA violation." *U.S. ex rel. Rockey v. Ear Inst. of Chi., LLC*, 92 F. Supp. 3d 804, 826 (N.D. Ill. 2015) (citation omitted).

Here, because Hubert has not sufficiently alleged an FCA violation in Counts I and II, he fails to show any injury resulting from a conspiracy to defraud the Government. *Kietzman,* 305 F. Supp.

3d at 980; *Rockey*, 92 F. Supp. 3d at 826. His conspiracy claim is thus doomed. Accordingly, Count III is dismissed.

### B.   Counts IV and V: IFCA Fraud Claims

Hubert's Illinois FCA claims—Counts IV and V—fail for the same reasons as the federal FCA claims, provided above. The Illinois FCA is an antifraud statute modeled after the FCA. *State ex rel. Beeler, Schad & Diamond, P.C. v. Burlington Coat Factory Warehouse Corp.*, 860 N.E.2d 423, 425-26 (Ill. App. 2006). "[C]ourts generally apply the same pleading standard for both federal and state FCA claims." *U.S. ex rel. Baum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 912-913 (N.D. Ill. 2015); *see also Ritacca v. Storz Med., A.G.*, 298 F.R.D. 566, 569 (N.D. Ill. 2014) ("Fraud claims based on state law . . . re subject to the heightened pleading standard of Rule 9(b) when brought in federal court."). Accordingly, for the reasons stated herein, Counts IV and V are also dismissed.

### C.   Leave to Amend

As a final note, the Court considers whether Hubert can file leave to amend.  "Rule 15(a) says that a party may amend its complaint once as a matter of course. After that, leave to amend depends on persuading the judge that an amendment would solve outstanding problems without causing undue prejudice to the adversaries." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 819 (7th

Cir. 2013). Hubert has attempted four times to amend his complaint to meet the particularity requirements of Rule 9(b). This Court has made clear that he will be permitted no further amendments. (*See* Dkt. No. 98.) Accordingly, Counts I-V, which comprise the entirety of this case, are dismissed with prejudice.

### III. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Dismiss (Dkt. Nos. 113, 115, 116, 117, 119, 121, 123, 124, 126, 132) are granted, and Hubert's Complaint (Dkt. No. 99) is dismissed with prejudice.

**IT IS SO ORDERED.**

_____
            Harry D. Leinenweber, Judge
            United States District Court

Dated: 11/29/2018